UNITED STATES *v.* JOVITA PEREZ
JOVITA PEREZ *v.* UNITED STATES

No. 7432.—Invoice dated Monterrey, N. L., Mexico, November 14, 1942.
Certified November 14, 1942.
Entered at Laredo, Tex., November 24, 1942.
Entry No. 1671.

First Division, Appellate Term

(Decided November 10, 1947)

*Paul P. Rao*, Assistant Attorney General (*Samuel D. Spector*, special attorney), for the United States.

*Lamb & Lerch* (*John G. Lerch* and *Thomas J. McKenna* of counsel); *Prew Savoy*, associate counsel; for the importer.

Before OLIVER, COLE, and MOLLISON, Judges

COLE, Judge: We are reviewing herein the decision of Judge Keefe (*Jovita Perez* v. *United States*, Reap. Dec. 6402), wherein the court

found a statutory cost of production, section 402 (f) of the Tariff Act of 1930 (19 U. S. C. § 1402 (f)). Said statute and the findings of the lower court are as follows:

| Section 402 (f), Tariff Act of 1930 | Findings of the lower court |
|---|---|
| (1) The cost of materials of, and of fabrication, manipulation, or other process employed in manufacturing or producing such or similar merchandise, at a time preceding the date of exportation of the particular merchandise under consideration which would ordinarily permit the manufacture or production of the particular merchandise under consideration in the usual course of business; | 4. That the cost of materials and fabrication in the production of the particular merchandise in question during said 13-month period is $89.70 per unit of six barrels of 50 gallons each, as claimed by the plaintiff. |
| (2) The usual general expenses (not less than 10 per centum of such cost) in the case of such or similar merchandise; | 5. That the usual general expenses were less than the statutory 10 per centum of the cost of the particular merchandise under consideration, and therefore the amount applicable herein is 10 per centum of the amount shown in paragraph 4, or $8.97. |
| (3) The cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the particular merchandise under consideration in condition, packed ready for shipment to the United States; and | 6. That the cost of packing and all other costs, charges, and expenses incident to placing the particular merchandise under consideration in condition, packed ready for shipment to the United States, was the amount agreed upon between counsel, to wit, $5.18 per unit of six barrels. |
| (4) An addition for profit (not less than 8 per centum of the sum of the amounts found under paragraphs (1) and (2) of this subdivision) equal to the profit which ordinarily is added, in the case of merchandise of the same general character as the particular merchandise under consideration by manufacturers or producers in the country of manufacture or production who are engaged in the production or manufacture of merchandise of the same class or kind. | 7. That the profit applicable to the merchandise at bar * * * is 35 per centum of the sum of the cost of materials of, and of fabrication, manipulation, or other process employed in manufacturing or producing such merchandise at a time preceding the date of exportation of the particular merchandise herein which would permit the manufacture or production of the particular merchandise under consideration in the usual course of business; and that such profit amounts to $31.40 per unit of six barrels. |

The lower court concluded "That the cost of production of the merchandise at bar during the 13-month period is the sum of the amounts shown in paragraphs 4, 5, 6, and 7, or $135.25 per unit of six barrels of 50 gallons each."

Both parties applied for a review of said decision under authority of section 501 of the Tariff Act of 1930 as amended by the Customs Administrative Act of 1938. The importer seeks a rate of profit lower than 35 per centum found by the trial judge. The Government's appeal embodies 13 assignments of error, and although some of them are directed toward the lower court's conclusions with respect to "usual general expenses" and "cost of materials and fabrication," Government counsel in their brief concede that "The particular item of dispute is the item of profit." Other assignments, alleging error, relate to the statutory construction applied by the lower court. Our disposition of the case does not require specific enumeration of the errors assigned; the discussion herein disposes of them in a general way.

The Pepsi-Cola Co., a domestic corporation, organized the Mexican-American Flavors Co., S. A., of Monterrey, Mexico, in August 1942, for the purpose of manufacturing flavoring sirup for use in the manufacture and bottling in the United States of the beverage popularly known as "Pepsi-Cola." The Mexican corporation was established

because the war created an acute shortage of sugar, one of the basic ingredients of Pepsi-Cola, and after an agreement had been reached between the Pepsi-Cola Co. and the Mexican Government to the effect that Mexican-American Flavors Co., S. A., would purchase "any surplus sugar they [Mexico] had without limit," the actual amount to be delivered being "the difference between what they needed for their local consumption in Mexico and the amount that was produced." The sirup thus manufactured was called "El Masco" and, being the sweetening element used in Pepsi-Cola, all production was sent to the United States for ultimate use.

The appeals before us cover the first shipment (a unit of six barrels, each of 50-gallon capacity) of "El Masco" sirup, but it has been agreed between the parties that the facts adduced herein concerning cost of production, section 402 (f), *supra*, concededly the proper basis for appraisement, shall apply to the entire period between November 1, 1942, and November 30, 1943, when the Mexican-American Flavors Co., S. A., was in existence, for although the original agreement provided for a 3-year period, it was terminated at the end of 13 months, when Mexico developed a sugar problem of her own. At the trial, the president of the Pepsi-Cola Co., Walter S. Mack, Jr., who supplied the foregoing facts, testified that the Mexican corporation was in the process of "liquidation."

The merchandise was entered at the invoice price of $51 per barrel, less nondutiable and c. i. f. charges, resulting in a net entered value for the unit (six barrels) of $167.06. The appraiser advanced the value to $215.16 for the unit.

Cost-of-production sheets relating to the manufacture of "El Masco" sirup were introduced by both parties. Those offered by the importer are attached to and form part of an affidavit (exhibit 1) executed by Joseph W. Pepperman, treasurer of Mexican-American Flavors Co., S. A. The analyses of cost records submitted by the Government are embodied in the special agent's report (exhibit 6). While the mathematical calculations of both compilations are in substantial agreement, there are discrepancies between them with respect to the allocation of individual items, which were explained in the testimony of Mr. Prew Savoy, counsel for the Pepsi-Cola Co., who supervised the cost-of-production data furnished by the importer. He referred specifically to two sets of items; one covering the cost of direct labor employed in production, and so reported by the importer, but which was treated by the Government as general overhead; and the other, representing charges for freight, storage, and insurance, is set forth in the Government's tabulation as part of the cost of material, while the importer charged the items under the caption "Usual and General Expenses" (page 3 of Cost-of-Production Data, exhibit 1, *supra*). The cost-of-production analyses, intro-

duced by both parties, support the statements of the witness. The lower court found $89.70, *supra*, as claimed by the importer, for the cost of materials and fabrication or other process employed in manufacturing. This conclusion is adopted herein.

Since there is no dispute between the parties concerning the trial judge's findings for "usual general expenses" of $8.97, and the cost of containers of $5.18, the stated amounts are accepted herein for the respective elements of statutory cost of production. Hence, the only question before us for determination is the item of profit, section 402 (f) (4), *supra*.

The Government contends that 98.15 per centum is the proper allowance to be made for profit on the theory that such percentage is representative of the amount of profit actually realized by the Mexican manufacturer of "El Masco" sirup, whose activities are controlling of the present issue. The importer argues for an addition for profit of from 14½ per centum to 16 per centum, basing such contention on the theory that our consideration herein should be limited to the operations of Mexican manufacturers of flavoring sirup, other than the exporter of the instant merchandise. In other words, the Government wants the business of the Mexican-American Flavors Co., S. A., the largest manufacturer with the greatest volume of sales, to be decisive of the item of profit, while the importer seeks a statutory construction which will eliminate the business operations of the manufacturer and exporter of the present merchandise and confine determination of the issue before us to the sales of other Mexican manufacturers of merchandise of the same class or kind.

*United States* v. *Henry Maier*, 21 C. C. P. A. 41, T. D. 46378, is cited by both parties in their briefs. That case concerned the cost of production for tariff purposes of merchandise exported from Germany. Because each of the parties herein regard the cited case as supporting its position, different from the other, we quote from the decision as it refers to the addition for profit:

It would appear, therefore, that it was not the intent of Congress, when it enacted said section 206, to limit the cost of production, in cases where said section was applicable, to the actual cost of production of the imported merchandise, including actual profit realized by the manufacturer, and we think a like construction should be given to said section 402 (e) of the Tariff Act of 1922. [Prototype of section 402 (f) of the Tariff Act of 1930.] In other words, as we construe said paragraph 4, it is not enough to establish what the ordinary profit of the manufacturer of the imported merchandise was, if merchandise of the same general character was produced and sold by others in the country of exportation, and the profit made thereon is reasonably ascertainable. If not so produced and sold by others, the profit ordinarily made by the manufacturer of the imported merchandise in producing goods of the same general character as the imported merchandise may be resorted to in arriving at the statutory cost of production. * * *

It is our view that there is no occasion for construing said paragraph 4 by eliminating any portion of it as unworkable, as indicated by the lower court, but that it should be reasonably construed to effectuate the apparent intent of Congress, viz, that the profits of the manufacturer of imported merchandise shall not be the sole criterion in the application of the statute, but where there is other evidence in the record, or available to the parties with respect to profits ordinarily made by other manufacturers of merchandise of the same general character as that imported, in the country of exportation, such evidence must be considered by the appraising officers and by the court upon reappraisement, and the amount of profit should be determined according to the weight of all the evidence bearing upon the subject.

It is clear from the foregoing quotation that actual profit of the manufacturer of the involved merchandise is not the sole criterion for finding the addition for profit under section 402 (f) (4), *supra*. Nor is the computation of such item of profit limited to any particular manufacturer or manufacturers, but rather to all—the manufacturer of the particular merchandise under consideration as well as other manufacturers of merchandise of the same class or kind—and "the amount of profit should be determined according to the weight of all evidence bearing upon the subject." That the lower court, however, did not follow this established formula, is disclosed by the following excerpt from its opinion:

The addition made for profit, however, is further restricted as it is required to be equal to the profit which ordinarily is added by other manufacturers in the country of production who manufacture merchandise of the same general character. To be "equal" is defined as being "the same in magnitude, quantity, degree, amount, worth, value, or excellence." (See Century Dictionary and Cyclopedia.) Therefore, not a higher nor a lower, but the same proportionate amount or percentage of profit is required by Statute to be applied in the cost of production formula as is applied by other manufacturers of merchandise of the same general character as the merchandise under consideration. The profit to be added in determining the cost of production of the sirup in question, therefore, is measured by the percentage of profit added by *manufacturers in the country of production other than the exporter of the instant merchandise.* (See *United States* v. *Heemsoth-Kerner Corp.*, 31 C. C. P. A. 75, C. A. D. 252.) [Italics ours.]

*United States* v. *Heemsoth-Kerner Corp.*, 31 C. C. P. A. 75, C. A. D. 252, does not support the reasoning of the lower court. That case concerned the value of printing type exported from Germany. The cost-of-production phase of the case turned on the construction given an affidavit of the managing director of the foreign manufacturer in which the affiant testified that "by reason of his familiarity with the trade in Germany as to the manufacture and sale of printing type of the class here in question, he can state of his own knowledge, and does so state, that the average profit made by his house represents the usual profit made by manufacturers in Germany in selling this class of merchandise." The court construed the quoted language to mean that "the usual profit made by other manufacturers in Germany of merchandise of the same general character as that here in question was

the same as the average profit made by the manufacturer of the instant merchandise," and accordingly held that "the profit ordinarily made by German manufacturers of merchandise of the same general character as that here involved equaled, or was the same, as the average profit made by affiant's company." Clearly, the court adhered to the rule adopted in the *Maier* case, *supra*, and considered the profits of the manufacturer of the particular merchandise as well as other manufacturers in Germany of the same general class of merchandise.

We now proceed to review the manufacturing activities of all manufacturers or producers of flavoring sirup, of the same class or kind as that in question, in Mexico during the period with which we are concerned. The parties agree there were four such manufacturers whose aggregate shipments to the United States were as follows:

Industrias Unidas _____ 20 shipments
Remigio J. Rodriguez _____ 43 shipments
Extractos y Sabores _____ 116 shipments
Mexican-American Flavors Co., S. A _____ 2,600 shipments

The number of shipments stated for each of the first three above-mentioned companies represents its entire output of flavoring sirup, while the 2,600 shipments by Mexican-American Flavors Co., S. A., were agreed to by the parties as "the number of importations made of the merchandise at bar during this representative period." (R. 91.)

The customs agent's report (exhibit 7) discusses the business operations of Industrias Unidas. The production of flavoring sirup was not a part of its regular business, having been developed as a side line. Its entire output of such sirup was shipped to two American importers, the Vess Beverage Co. and the Red Rock Bottlers, who supplied, without cost to the Mexican manufacturer, all caramel coloring and phosphoric acid used in producing the flavoring sirup and also sent over employees to supervise (at the American importer's expense) the process of manufacture. No cost-of-production records and no complete accounting system relating to transactions in flavoring sirup were maintained by Industrias Unidas.

The vice president of the said Mexican company, A. F. Longoria, who supplied information contained in the customs agent's report, said exhibit 7, also appeared as a witness at the trial in Laredo and executed two affidavits, exhibits 2 and 5. In view of the witness' explanation, as reported by the customs agent, concerning the unique arrangement, having the two exclusive American importers supply labor and materials without cost to Industrias Unidas, and the fact that no accurate accounting records were kept from which to calculate a statutory cost of production, the testimony of the witness concerning his company's production costs has no probative value to the present issue. His statement in the earlier affidavit, exhibit 2, relating to the "profit ordinarily added" by other producers loses all force and

effect by the admission in his later affidavit, exhibit 5, that such "information was based upon conversations he had with such other producers and he does not know of his own knowledge whether the information is accurate."

The manufacturing operations of Remigio J. Rodriguez of Nuevo Laredo, Mexico, are outlined in the customs agent's report, exhibit 8. Said manufacturer produced different kinds of flavoring sirups, i. e., nu-grape, root beer, cola, strawberry, and orange. Except for the nu-grape, all the sirups were manufactured under a common formula from raw materials furnished by the manufacturer's own suppliers, and were sold, without reservation, to different American importers. The nu-grape sirup was exclusively manufactured under a special formula for a firm in Atlanta, Georgia, who supplied some of the materials, the cost thereof being applied as part payment against the finished sirup delivered by the Mexican manufacturer. Remigio J. Rodriguez kept no cost-of-production records. "His enterprise was too small for any elaborate study of the cost of production, and the margin of profit was so great, that no close study of costs was necessary." (Exhibit 8.) In the presence of the customs agent, the manufacturer calculated a set of production costs but its presentation is inadequate under the requirements of the statutory definition, section 402 (f), *supra*.

Remigio J. Rodriguez also executed two affidavits, exhibits 3 and 11. In the first, exhibit 3, he made certain statements concerning profits ordinarily added by producers of this class of flavoring sirup, but in the second affidavit, exhibit 11, he explained that his statements in the earlier one were "based or estimated on the practice which I have on such matters and facts, prevailing circumstances on the market, etc., which at that time prevailed in the manufacture of syrup, although these were not taken directly from my books, they are based approximately on facts." The proof relating to said witness' business activities is not convincing. Nothing contained therein can be applied toward a proper determination of the question before us.

Extractos y Sabores of Monterrey, Mexico, manufactured two products, "Sweetening Compound" and "Flavored Syrup," of the class or kind with which we are concerned in the present issue. In an affidavit (exhibit 10) executed by the director-general of the company, William E. Hughes, affiant sets forth the following sketchy tabulation of production costs for a gallon of the "Flavored Syrup":

| | |
|---|---|
| Average cost of sugar, per gallon of syrup | $0. 33672 |
| Cost of caramel and acid, per gallon of syrup | . 03500 |
| | . 37172 |
| Labor, overhead and profit | . 10000 |
| | $0. 47172 U. S. cy |

The witness then testified that he "has not broken down the item cited as labor, overhead, and profit, in the above tabulation, and cannot, at this time, accurately state the exact amount of profit he added in the manufacturing operation referred to above." Concerning the "Sweetening Compound," the said affiant testified that he "has computed that the profit added in manufacturing and selling the sweetening compound was approximately seventy-five per centum of the cost of materials, labor and overhead." No details are furnished to show whether the computation referred to meets the statutory formula, section 402 (f), *supra*. Instead, a customs agent's report, exhibit 9, discussing the manufacturing operations of Extractos y Sabores, states that all the "Flavored Syrup" manufactured by the said Mexican producer was made especially and sold to one American importer, Red Rock Bottlers, who supplied the caramel and phosphoric acid used in the finished sirup and received credit from the manufacturer for the cost of said materials as well as for freight and duty charges, and that "Mr. Hughes had no data from which cost of production could be obtained." The condition disclosed by the said report materially weakens the statements of the director-general of Extractos y Sabores, as presented in the affidavit, exhibit 10, *supra*.

The evidence, relating to each of the three Mexican manufacturers hereinabove reviewed, does not support the reason for which it was offered. None of them maintained adequate books of account or other substantial records upon which the provisions of section 402 (f) (4), *supra*, can be applied. The proof relating to their business activities falls far short of satisfying the purpose for which it was intended. *United States* v. *Philipp Wirth et al.*, 24 C. C. P. A. 188, T. D. 48654.

On the other hand, Mexican-American Flavors Co., S. A., the exporter of the instant merchandise and an affiliate of the Pepsi-Cola Co., was established for the exclusive purpose of manufacturing "El Masco" sirup, and its operations were confined thereto. It was organized and operated in a highly efficient manner, maintaining very thorough accounting records, as reflected in the authentic cost-of-production sheets, hereinabove discussed. For the purposes of this case, the said company is the sole producer of merchandise of the same class or kind as the particular merchandise under consideration. Under such circumstances, and following the principle enunciated in the *Maier* case, *supra*, the allowance to be made for profit in determining cost of production herein is the amount ordinarily added by the Mexican manufacturer of the instant merchandise, and which we now determine.

The allowance for profit, 98.15 per centum, claimed by appellant, is the rate applied by the customs agent in his report (exhibit 6), computing cost of production of "El Masco" sirup as follows: The

selling price of 17 units (a carload) at $296 per unit, totalling $5,032, is used as the basic figure, from which are deducted certain non-dutiable charges, sugar tax "at .5144¢ on (say) 32,725 lbs.," and "duty at 20%," resulting in an amount, $3,494.33, that is characterized "Dutiable value." The sum of "Cost of materials and labor," "Overhead at 11.63972%," and "packing," amounting to $1,807.11, is deducted from the so-called "Dutiable Value," and the difference, $1,687.22, is labeled "PROFIT or 98.15% on materials, labor and overhead."

In appraising the instant merchandise and using an addition for profit of 98.15 per centum, the appraiser followed instructions issued by the acting commissioner of customs "To Customs Appraising Officers and Others Concerned" in T. D. 48860, wherein the said Treasury official, interpreting language identical with that contained in section 402 (f) (4), *supra*, stated that the "* * * 'profit which is ordinarily added in the case of merchandise of the same general character as the particular merchandise under consideration, by manufacturers or producers in the country of manufacture or production who are engaged in the same general trade as the manufacturer or producer of the particular merchandise under consideration', is the usual difference between the manufacturers' or producers' selling prices of such merchandise of the same general character and all costs and expenses incurred by such manufacturers or producers in connection with such merchandise."

The special agent's application, as hereinabove outlined, of the said administrative ruling, which the appraiser accepted in appraising the instant merchandise, cannot be viewed as determinative of the addition for profit in finding the statutory cost of production of the merchandise under consideration. Certain basic figures in the calculations are mere assumptions of values they purport to represent, having no foundation in fact or in law. First of all, the term "Dutiable Value," as used in the tabulation, is a misnomer, because the dutiable value of the instant merchandise cannot be determined until all of the issues presented herein become final and conclusive on all parties. Furthermore, it is fundamental that "Dutiable Value" is not the result of a computation like that employed in the report, exhibit 6, *supra*, using the selling price of merchandise as a focal point for subsequent operations. Then, too, the amount shown for "duty" must be regarded as a mere guess at this stage of proceedings, for the collector's classification, with consequent assessment of duty, cannot be made until the final appraised value of the merchandise is known, and this conclusion is also dependent upon the outcome of the present case. We therefore hold the appraiser's advance for profit of 98.15 per centum to be erroneous.

The evidence introduced by the importer concerning the element of profit in the fiscal affairs of the Mexican-American Flavors Co., S. A., is not as definite as might be expected from the officials who offered proof on the proposition. In his affidavit, exhibit 1, *supra*, the treasurer of the Mexican manufacturer of the "El Masco" sirup in question, directed all of his testimony dealing with profit to the activities of producers of a commodity "in the nature of a sugar syrup" that is of the "same general character as 'El Masco'," and specific mention is made of two firms, Remigio Jasso Rodriguez and Industrias Unidas, whose business records are hereinabove discussed and found to be insufficient for the purposes of this case. Said affiant does not say a single word about the profit of his own organization. The only reference to a statement by the witness concerning a profit by his company is found in the special agent's report, exhibit 6 (page 3), stating: "Mr. Pepperman said that this price [$296 per unit of six barrels of fifty gallons each] was intended to yield a profit to the Mexican corporation of 20% on gross sales." The estimated profit of 20 per centum is a contradiction of testimony offered by the president of the same corporation, hereinafter reviewed.

Counsel for the Pepsi-Cola Co. testified if he were to add unusual and extraordinary expenses of the Mexican-American Flavors Co., S: A., to the production costs set forth on exhibit 1, the preparation of which he supervised, he "would estimate the profit to the company, before taking into account any liquidation losses, at about 27 per centum." (R. 64.) The statute, section 402 (f) (2), does not contemplate unusual and extraordinary expenses, so a figure, including such items, is not material to the present issue.

The president of the Pepsi-Cola Co., who was also president of the Mexican-American Flavors Co., S. A., testified that he supervised the plant organization of the Mexican concern and also fixed the selling price of "El Masco" sirup. The price remained constant throughout the entire period when the Mexican corporation was in operation. The witness' calculations, which he called a "price estimate" of the different costs of the various factors entering into the manufacture and exportation of one unit of "El Masco," were explained, and included an item of profit in the amount of $44. The items were estimates of cost elements made by the witness when the Mexican company was organized and at the time the selling price was definitely established. As stated by the witness, that is "as we planned it, and if it had been allowed to continue this is what we estimated we would have made [referring to profit]." (R. 49.)

When the witness was pressed on cross-examination for an expression as to the profit actually realized, he insisted that "During the operation of the company at no time could we figure what our ultimate profit or loss was going to be, until we had some of these prob-

lems settled." The witness referred to unsettled questions relating to the liquidation of the company.

Thus, we have a record before us in which the only amount, $44, indicative of the profit ordinarily added by the Mexican manufacturer of the instant merchandise, is the result of the computation by the president of the corporation, who is regarded as eminently qualified to offer such testimony. Said figure is therefore accepted, on the basis of the proof adduced herein, as controlling in finding the item of profit required under section 402 (f) (4).

For the reasons hereinabove set forth, we find as matter of fact:

(1) That the proper basis for appraisement of the "El Masco" sirup in question is cost of production, section 402 (f), *supra*.

(2) That the cost of materials of, and of fabrication, manipulation, or other process employed in manufacturing or producing said merchandise, as contemplated by paragraph (1) of said section 402 (f), is $89.70 per unit of six barrels of 50 gallons each.

(3) That the applicable amount for usual general expenses, paragraph (2) of section 402 (f), *supra*, is 10 per centum of the cost of materials and fabrication, set forth in finding of fact (2), or $8.97.

(4) That the cost of packing and all other costs, charges, and expenses incident to placing the particular merchandise under consideration in condition, packed ready for shipment to the United States, paragraph (3) of section 402 (f), is $5.18 per unit.

(5) That the profit applicable herein, paragraph (4) of section 402 (f), is $44, or 44.59 per centum of subparagraphs (1) and (2) of said section 402 (f).

Accordingly, we hold as matter of law that the statutory cost of production of a unit of six barrels of 50 gallons each of the "El Masco" sirup under consideration is the sum of the amounts stated in findings of fact (2), (3), (4), and (5), or $147.85.

The judgment of the lower court is modified accordingly.

The statutory value found herein is lower than the importer's entered value, but the latter becomes the basis for assessment of duties under the provisions of section 503 of the Tariff Act of 1930.